# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

SCOTT T. MOTLEY,                           )
                                           )
                Petitioner,                )
                                           )
        vs.                                )        Case No.  05-0827-CV-W-FJG-P
                                           )
MICHAEL BOWERSOX,                          )
                                           )
                Respondent.                )

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS

Petitioner, Scott T. Motley, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on September 8, 2005, seeking to challenge his 2000 convictions and sentences for second degree burglary, first degree murder, and armed criminal action, which were entered in the Circuit Court of Boone County, Missouri.  Petitioner raises ten grounds for relief: (1) ineffective assistance of trial counsel for failing to call Evan Garrison as a witness; (2) ineffective assistance of trial counsel for failing to elicit exculpatory testimony from prosecution witness Brian Hoey; (2) ineffective assistance of trial counsel for failing to investigate an alibi defense; (4) ineffective assistance of trial counsel, direct appeal counsel, and post-conviction counsel for failing to disclose to petitioner that the state's evidence excluded petitioner from the crime scene; (5) ineffective assistance of trial counsel for failing to object to hearsay testimony; (6) trial court error in granting the state's motion in limine to exclude the testimony of witnesses Alphonzo Adams and Roberta Lorenson; (7) trial court error in admitting petitioner's statements to police into evidence because: (a) petitioner's statements were involuntary; and (b) petitioner's statements were obtained in

violation of his <u>Miranda</u> rights;[1] (8) ineffective assistance of trial counsel for allowing the prosecution to elicit false testimony from its witness; (9) ineffective assistance of trial counsel for failing to call Jenny Smith as a witness; and (10) trial court error in submitting accomplice liability instructions to the jury.

Respondent concedes exhaustion of petitioner's grounds for relief. However, respondent contends that Grounds 1, 2, 5, 6, and 7(a) are without merit and that Grounds 3, 4, 8, 9, and 10 are procedurally defaulted. Respondent does not state a position as to Ground 7(b).

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> Motley was charged by substitute information with acting in concert with Dennis Summers in committing murder in the first degree, burglary in the first degree, and armed criminal action. Beginning on March 22, 2000, Motley was tried before a jury. During the trial, the court granted Motley's request for a mistrial. Motley was retried on May 17-19, 2000. The following evidence was adduced at trial:
>
> Motley was an early suspect regarding the murder of Mark Throop. Co-workers of Mark Throop contacted the police on May 24, 1999, after discovering his stabbed and beaten body in his home. Upon investigating the crime scene, the police found: several envelopes addressed from Motley to various creditors; notes listing the names of Motley's creditors and the amount of the debts Motley owed to each creditor; and a letter addressed from Motley to Throop, date May 9, 1999. The police found two monogrammed handkerchiefs with the initial "T" in a drawer in the master bedroom A search of Throop's truck revealed a checkbook that was missing the last check (#2550). The carbon copy of the missing check remained in the checkbook, but it was blank. There was a finger print on the carbon of the preceding check #2549, and police later determined that print matched Motley's.
>
> On May 24, 1999, several hours after Throop's body was found,

---

[1]In his petition, petitioner makes a vague allegation that his statements to police were obtained in violation of his <u>Miranda</u> rights and petitioner makes it clear in his reply that he is asserting this claim. Because Ground 7(a) was properly raised in the Missouri Court of Appeals, while Ground 7(b) was not, the Court has divided these claims into two subparts.

Motley cashed the missing check from Throop's checkbook for $800.00 at Perry State Bank in Monroe City. The check was made out to Motley and purported to have been signed by Throop. The investigating officers attempted to find Motley at his mother's residence, but as he was not there, the officers left a message that Motley contact the officers as soon as possible for an interview.

May 25, 1999, Interview. Motley came into the Monroe City Police Department to be interviewed in the mid-afternoon on May 25. Investigator Ryan Jezylo conducted this first interview. The investigator questioned Motley about his relationship with Throop. Motley described Throop as his "best friend," and indicated that he had last seen Throop May 19, 1999. Jezylo asked Motley if he knew why he was being questioned about Throop. Motley answered no, at which time Jezylo informed Motley that Throop was dead. Motley said he had nothing to do with Throop's death.

Motley told Jezylo about his whereabouts the night of May 18, 1999, through the several days leading up to Throop's death. Motley denied having anything to do with Throop's death. Motley claimed that the last time he had seen Throop was on May 19. Motley stated that Throop had agreed to lend him funds to help him resolve several outstanding debts and enable Motley to obtain an apartment. Motley made written notes regarding his outstanding debts (totaling $694.00) and prepared envelopes for each creditor. According to Motley, Throop was to purchase money orders and mail them in the pre-addressed envelopes to satisfy those debts. Motley also indicated that Throop had provided him with $560.00 in cash.

As the interview progressed, Jezylo learned that the check #2550 from Throop's checkbook was cashed by Motley on May 24, 1999. When asked about the check, Motley stated that Throop had given him a signed check with the dollar amount blank, with instructions that Motley could complete the check, so long as it was under a thousand dollars. Jezylo advised Motley that the carbon copy in Throop's checkbook indicated that Throop did not sign the check. Despite this information, Motley denied that he had signed check #2250, or knowing that the check was from the back of Throop's check book. Jezylo also inquired regarding the May 9 letter from Motley to Throop, and Motley indicated that he wrote the letter to Throop in an attempt to persuade Throop to lend him money. At that point, Motley acknowledged that he was attempting to "con" Throop out of money.

During this interview, Motley was also questioned about his

whereabouts on the morning of the murder. Motley first indicated that he had slept at the residence of Donald Smith, one of his acquaintances, from approximately 1:30 a.m. on May 24 until noon. While Motley was still being interviewed, other officers contacted Smith, who indicated that Motley had not arrived at his residence until approximately 7:00 a.m. on May 24. When confronted with this discrepancy, Motley amended his version of events, and now claimed to have spent part of the early morning hours at an abandoned house next door to his parent's residence.

Later in the interview, Motley was read his *Miranda* warnings, and he consented to a standardized hand writing analysis. After completion of the analysis, Jezylo asked Motley if he would be available for another interview the following day at the Centralia Police Department. Motley agreed to meet with Jezylo again the next day, and then he left, between eight and ten hours after the interview began.

May 25, 1999, Interview. Motley arrived voluntarily at the Centralia Police Department, per Jezylo's request. Jezylo told Motley that he did not believe Motley's story. Motley continued to deny any involvement in the murder, however. After reviewing various parts of Motley's prior statement, Motley was allowed to leave the station.

June 10, 1999, Interview. Jezylo and Officer Stubbs were at the Monroe City Police Department, when they observed Motley sitting near a conference room. Motley had been arrested earlier on an outstanding warrant in an unrelated matter. The officers asked Motley if he was willing to speak with them further regarding the murder of Throop. Motley agreed to another interview, and again recounted his verison of the events from May 18 through May 24.

When confronted with the information that handwriting analysis had indicated that Motley had signed the check, and that a witness had observed Motley with Throop's handgun, Motley again denied forging Throop's signature but admitted taking the gun. He then said: "Okay. I'll tell you what really happened." At that point, Motley was again read his *Miranda* rights.

When the interview resumed, Motley indicated that on May 19, 1999, he was looking for envelopes in Throop's desk, and discovered a pistol. Motley removed the pistol from its holster, and borrowed it along with three bullets. He stated that when he removed the gun from the holster, he observed what he thought was cocaine or methamphetamine inside the bottom of the holster. With regard to

-4-

the forged check, Motley claimed that Throop gave him a blank check, and he admitted that he forged Throop's signature. Motley claims he had not cashed the check earlier because he was waiting to determine if Throop had actually paid Motley's debts.

At first, Motley continued to deny having any knowledge about Throop's murder. As the interview progressed, however, Motley told Jezylo a new version of events of the days leading to and after Throop's murder. In the new version, Motley denied being at the crime scene but implicated Dennis Summers as Throop's murderer. At which time, Jezylo left the interview and requested that the police locate Dennis Summers for questioning. Summers was located and arrived at the police station later that evening. Upon his arrival, [] officers Stubbs and Jezylo conducted separate interviews. Jezylo spoke with Summers, and Officer Stubbs continued with Motley.

Summers agreed to cooperate and later accompanied Jezylo to some discarded bloody clothes and some of Throop's items along a highway. The police recovered several of Throop's belongings, including a handkerchief monogrammed with the initial "T." Summers allowed the police to search his vehicle and gave the police a video[-]taped statement. Summers told police that on the night of the murder, he and Motley traveled in his truck to Throop's residence to steal drugs. Motley exited the truck and went into Throop's home, while Summers circled the neighborhood. Summers parked about a half a block away from Throop's home and waited for Motley to come out.

After being informed that Summers was cooperating with police, Motley admitted to being at the crime scene but denied having committed Throop's murder. Motley began to describe another version of events surrounding Throop's murder. In his newest and third version of events, Motley and Summers had driven to Mexico, Missouri, to purchase cocaine. They consumed the first purchase and returned to Mexico to purchase more. Before returning to Mexico, however, Motley changed clothes, placing the sweatpants and shirt he was wearing into a half-empty case of beer in the back of Summers' truck. The second purchase was unsuccessful, as Motley did not have sufficient funds to make the purchase. The two of them went to Throop's home to steal the drugs in the holster, as Motley believed that Throop was out of town. Motley stated that Throop had given Motley a key to Throop's home when he stayed there on a prior occasion.

Once they arrived at Throop's residence, Motley claimed that

Case 4:05-cv-00827-FJG   Document 13   Filed 04/19/06   Page 5 of 23

Summers exited the vehicle, taking a knife attached to the sun visor, and went inside of Throop's home. Motley circled a few blocks in Summers car and waited for Summers to come out of Throop's home. Summers came out and met Motley at the truck. Summers did not appear to have anything on his person and he did not have any drugs. Motley said that Summers rummaged in the back of the truck, and when he sat back in the vehicle, he smelled of gasoline. Summers then grabbed Motley's shirt and repeated: "There was no [expletive] drugs." Motley and Summers left Throop's home, driving out into the surrounding countryside. Summers stopped the truck several times during that time. During those stops, Summers used the restroom, and "messed around" in the back of the truck. Motley claims to have been unable to see what Summers was doing in the back of the truck. Motley stated that he had previously given Throop's gun to Summers in exchange for driving him around that day.

After describing these events, it was approximately 1:30 a.m., roughly 8.5 hours after the interview began. Stubbs advised Motley of his *Miranda* rights, and requested that Motley prepare a written statement. Motley consented, and completed his written statement [at] about 4:00 a.m. He apparently slept for an undetermined time in the interview room before being arrested and taken to the Centralia Police Department. While being transported, Motley also gave a verbal amplification of his written statement. This additional statement was transcribed by another officer in the vehicle and given to Motley to review and sign. After his arrival in Centralia, Motley slept for roughly two hours. He then agreed to give a video-taped statement, which began at 10:48 a.m. on June 11, and lasted approximately forty-five minutes.

Prior to his trial, an evidentiary hearing was held regarding the admissibility of Motley's statements to the investigating officers. Motley claimed that those statements were coerced due to the repeated nature of the questioning, together with deprivation from sleep and food. The trial court denied Motley's request that those statements be excluded from the evidence at trial. The State also filed a motion in limine to prohibit two defense witnesses, Roberta Lorenson and Alphonzo Adams, from testifying at trial. These witnesses claimed to have been told by Summers that he killed Throop and was attempting to frame Motley for the crime. At a pretrial hearing on April 27, 2000, the trial court took the State's motion under advisement. At trial, shortly before the State rested, the trial court granted the State's motion in limine, excluding the testimony of these two witnesses.

-6-

> At the close of the evidence, the jury found Motley guilty of second
> degree burglary, first degree murder, and armed criminal action. This
> appeal follows.

(Respondent's Exhibit "G," pp. 1-7).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[2] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## GROUND 1 - INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO CALL EVAN GARRISON AS A WITNESS

In Ground 1, petitioner alleges that the Missouri Court of Appeals ruling erroneously concluded that there were only two shoe impressions analyzed by Evan Garrison and these impressions were insufficient to make an identification. Petitioner contends that there were actually four shoe impressions. Two of those impressions were sufficient make an identification and they did not match petitioner's shoes, while two other impressions were not sufficient to make any identification. Petitioner alleges that his trial counsel's failure to call Mr. Garrison as a witness was ineffective assistance of counsel. Respondent contends that this ground for relief is without merit.

---

[2]In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

-7-

In order to succeed on petitioner's claim of ineffective assistance of trial counsel, petitioner must establish that: (1) his counsel's performance was unreasonable as viewed in the totality of the circumstances; and (2) his defense was prejudiced by counsel's actions in that there is a reasonable probability that, but for counsel's unprofessional acts, the results of the trial would have been different. Strickland v. Washington, 466 U.S. 668, 694-95 (1984); Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985). Reasonably effective assistance of counsel may be defined as the skill and diligence that a reasonably competent attorney would exercise under similar circumstances. See, e.g., Strickland v. Washington, 466 U.S. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

On appeal from the denial of petitioner's Rule 29.15 motion, the Missouri Court of Appeals rejected this ground as follows:

> First, Motley claims that his trial counsel was ineffective for failing to call Evan Garrison, a criminalist working for the Missouri State Highway Patrol, who had examined footwear impressions collected from the crime scene. Motley argues that Garrison's testimony, had he been called to testify at trial, would have established that the impressions did not match any of his shoes taken by the police, thus casting doubt as to whether he was present when the crime took place.
>
> At the evidentiary hearing, Garrison testified that he compared the two footwear impression taken from the crime scene with four different pairs of shoes seized from Motley and was unable to match the impressions with any of the shoes. Specifically, Garrison testified that "those two impressions lacked quality and detail for meaningful comparisons." However, Garrison's testimony is neither inculpatory or exculpatory; it merely indicates that Garrison could not establish whether the impressions were made by the shoes seized from Motley. Because such evidence would not have contributed to Motley's defense, Garrison's testimony would not have affected the outcome of the trial. Therefore, Motley was not prejudiced by trial counsel's failure to call Garrison to testify.

-8-

(Respondent's Exhibit "L," pp. 3-4).

The resolution of Ground 1 by the state courts did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Terry Williams v. John Taylor, 529 U.S. 362, 412-13 (2000).[3] Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that trial counsel was not ineffective.

Ground 1 is denied.

### GROUND 2 - INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILING TO PROPERLY QUESTION A PROSECUTION WITNESS

In Ground 2, petitioner alleges that his trial counsel was ineffective for failing to elicit exculpatory evidence from prosecution witness, Brian Hoey, who could have testified that of the fifty items admitted into evidence and tested for biological fluids, none of them was connected to petitioner. Respondent contends that this ground for relief is without merit.

On appeal from the denial of petitioner's Rule 29.15 motion, the Missouri Court of Appeals rejected this ground as follows:

> Next, Motley claims that his trial counsel was ineffective for failing to elicit exculpatory testimony from the State's witness, Brian Hoey, who had analyzed nearly fifty items taken from the victim's home to

---

[3]According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13.

detect the presence of any bodily fluids. Specifically, Motley argues that trial counsel should have elicited testimony that would have established that, out of the forty-seven items tested, only one item – a swab taken from the victim's bathroom sink – contained genetic material that was consistent with Motley's genetic profile.

Again, Motley cannot show that he has been prejudiced in any way. First, Motley's trial counsel did ask a question concerning the number of the items tested by Hoey, to which Hoey answered, "approximately [fifty]." Therefore, the number of items tested was in fact before the jury. Second, such evidence was not exculpatory; there was genetic material that was consistent with Motley's genetic profile found in the victim's home. Thus, there was evidence that connected Motley to the crime scene. The fact that the other items tested did not contain a match does not refute that fact.

(Respondent's Exhibit "L," pp. 4-5).

The resolution of petitioner's second ground for relief by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Terry Williams v. John Taylor, supra. Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that trial counsel was not ineffective.

Ground 2 is denied.

## GROUND 5 - INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO OBJECT TO HEARSAY TESTIMONY

In Ground 5, petitioner alleges that his trial counsel was ineffective for failing to object to the hearsay testimony of Ryan Jezylo, who testified that petitioner's co-defendant, Dennis Summers, told him in jail that petitioner was the murderer. Petitioner alleges that Mr. Summers did not testify at trial and Mr. Jezylo's testimony was, therefore, hearsay. Respondent contends that this ground

-10-

for relief is without merit.

On appeal from the denial of petitioner's Rule 29.15 motion, the Missouri Court of Appeals rejected this ground as follows:

> Finally, Motley also claims that his trial counsel was ineffective for failing to object when one of the investigating officers testified that Summers, Motley's co-defendant, implicated him in the death of the victim. Motley argues that the statement constituted inadmissable hearsay, the introduction of which altered the outcome of the trial.
>
> The testimony was not inadmissable as hearsay. Out-of-court statements that explain subsequent police conduct are admissible to supply relevant background and continuity. *State v. Dunn*, 817 S.W.2d 241, 243 (Mo. banc 1991). This includes using such statements to demonstrate why an investigation focused on the defendant. *State v. Howard*, 913 S.W.2d 68, 70 (Mo. App. 1995). Here, Motley was the original murder suspect, but after interrogating Motley extensively, the police decided to investigate Summers as a potential suspect as well. After Summers implicated Motley in the crime and led police to the location where several items belonging to the victim were found, the police again resumed their questioning of Motley. Thus, the "hearsay" testimony was not used to prove the truth of the matter asserted; rather, it was used to show why the police resumed its investigation of Motley after they had questioned Summers. Point denied.

(Respondent's Exhibit "L," p. 5).

The resolution of petitioner's fifth ground for relief by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Terry Williams v. John Taylor, supra. Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that trial counsel was not ineffective.

Ground 5 is denied.

-11-

## GROUND 6 - TRIAL COURT ERROR IN EXCLUDING WITNESS TESTIMONY

In Ground 6, petitioner alleges that the trial court erred when it granted the prosecution's motion in limine to exclude the testimony of witnesses Alphonzo Adams and Roberta Lorenson who would have testified that Dennis Summers told them he was the true killer and that he "set petitioner up for the murder." Petitioner also alleges trial court error in prohibiting petitioner from calling Mr. Adams and Ms. Lorenson as witnesses. Respondent contends that this ground for relief is without merit.

As a preliminary matter, this ground for relief raises an evidentiary issue. "Questions relating to the admissibility of evidence are matters of state law and generally do not give rise to constitutional errors which are subject to redress in federal habeas corpus cases." Harrison v. Dahm, 880 F.2d 999, 1001 (8th Cir. 1989) [quoting Maggitt v. Wyrick, 533 F.2d 383, 385 (8th Cir.), cert. denied, 429 U.S. 898 (1976)]. Only if the alleged error violates a specific constitutional right or is so prejudicial that it denies due process may a federal court grant habeas corpus relief on a state evidentiary issue. Clark v. Groose, 16 F.3d 960, 963 (8th Cir. 1994).

On direct appeal, the Missouri Court of Appeals held as follows:

> For his first point on appeal, Motley argues that the trial court erred in granting the State's motion in limine, excluding the testimony of Adams and Lorenson at trial. These witnesses' testimony concerned certain hearsay statements allegedly made by Summers, in which Summers admitted killing Throop and his intent to accuse Motley and White of the Murder. Summers statements, if believed, would have exonerated Motley. Motley argues that the trial court's ruling violated his right to call witnesses in his favor and due process of law. He contends that Summers' hearsay statements were admissible under the doctrine of *Chambers v. Mississippi*, 410 U.S. 284, ... (1973), because the statements were against Summers' penal interest and were corroborated by other evidence presented at trial. The State replies that the trial court's ruling was correct because Summers' alleged admission did not meet the required idicia of reliability for a statement against penal interest, as they were not corroborated by

Case 4:05-cv-00827-FJG   Document 13   Filed 04/19/06   Page 12 of 23

other evidence. The State further contends that *Chambers* is distinguishable because Summers was unavailable to testify at trial (due to his invocation of Fifth Amendment privilege).

In reviewing a trial court's ruling upon a motion to exclude evidence at trial, we recognize that "[a] trial judge has wide latitude in ruling on whether to admit or exclude evidence." *State v. Clark*, 711 S.W.2d 928, 932 (Mo. App. 1986). "Absent clear abuse, an appellate court will not interfere with the trial court's ruling on the admission or exclusion of evidence." *Id.* The issue, then, is whether the exclusion of this testimony constituted an abuse of discretion. To resolve that issue, we must apply the principles articulated in *Chambers* to determine whether Motley was entitled to present the testimony of Adams and Lorenson to the jury.

As a general matter, a statement against interest made by an unavailable hearsay declarant is not admissible in criminal actions in Missouri. *State v. Blankenship*, 830 S.W.2d 1, 6-8 (Mo. banc 1992). The *Chambers* doctrine, as adopted in Missouri, provides an exception to that general rule. Under *Chambers*, a hearsay statement that tends to exculpate the defendant and is against the penal interest of the hearsay declarant may be admissible when offered by the defendant. The hearsay statement, however, must be made under circumstances demonstrating "considerable assurance of their reliability." *State v. Skillicorn*, 944 S.W.2d 877, 885 (Mo. banc 1997) (quoting *Chambers*, 410 U.S. at 300). To establish its reliability, a tripartite test must be met by the hearsay statement: (1) the statement must be "in a very real sense self-incriminatory and unquestionably against interest;" (2) the statement must be made spontaneously to a close acquaintance shortly after the crime was committed; and (3) the statements are corroborated by other evidence. *See State v. Smulls*, 935 S.W.2d 9, 21 (Mo. banc 1996) (citations omitted).

The State argues that the application of the *Chambers* doctrine in Missouri requires that the hearsay declarant (Summers) be available for testimony. This court recently held, however, in *State v. Guinn*, WD57191, Slip Op. at 10 (Mo. App. W.D. July 31, 2001), that *State v. Davidson*, 982 S.W.2d 238, 242 (Mo. banc 1998), requires the admission of a declaration against penal interest of an unavailable declarant if the other elements of *Chambers* are satisfied. The State appears to concede in its brief that the first element of the *Chambers* test is satisfied with regard to the hearsay statement of both Lorenson and Adams. The two residual questions, then, are whether the remaining elements are met, and whether the statements were made

-13-

under circumstances tending to support their reliability.

Lorenson's testimony fails to meet the *Chambers* test on two grounds. First, Lorenson, by her admission, was not a close acquaintance of Summers. Lorenson testified that while she had known Summers for about one year, she also testified that they were not close friends. There was also some degree of temporal separation between the crime and the conversation between Lorenson and Summers -- roughly six days – leaving a question whether the conversation truly took place "shortly after" the crime was committed.

The second ground upon which Lorenson's testimony fails under the *Chambers* test is more fundamental. Specifically, her testimony is suspect due to her alcohol consumption. Lorenson testified that she had consumed eighteen beers on the day the conversation took place. The trial court specifically found that the amount of Lorenson's alcohol consumption rendered her recall of events unreliable. Motley has failed to present sufficient facts to show that this finding was arbitrary or against the weight of the evidence. Thus, the trial court did not err in excluding her testimony regarding Summer's hearsay statements.

The conversation between Adams and Summers took place on July 14, 1999, nearly two months after the murder. Both were incarcerated in the Boone County jail at the time. Adams stated that he considered Summers to be a friend, but that it was not a close friendship. Nevertheless, the two continued to correspond after one or the other individual was transferred to another place of confinement. Under these facts, we hold that the trial court did not err in excluding the testimony provided by Adams. First, the record reflects that Adams was not a close acquaintance of Summers. More significantly, however, Summers' alleged statements were not made in close proximity to the time of the murder. Simply put, we find that the elapsed two months between the murder and Summers' alleged statement too extended. As the testimony provided by Adams fails to satisfy the elements of *Chambers*, it is properly excluded from the evidence at trial.

In summary, neither Lorenson's nor Adams' testimony was properly admissible under the Chambers doctrine. Accordingly, Motley's second point on appeal is denied.

(Respondent's Exhibit "G," pp. 7-10).

The resolution of petitioner's sixth ground for relief by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Terry Williams v. John Taylor, supra.

Ground 6 is denied.

## GROUND 7(a) - TRIAL COURT ERROR IN ADMITTING PETITIONER'S STATEMENTS TO POLICE

In Ground 7(a), petitioner alleges that the trial court erred when it denied petitioner's motion to suppress statements he made to police because his statements were coerced and obtained in violation of petitioner's Constitutional rights. Petitioner also alleges that the trial court erred when it admitted these statements into evidence over petitioner's objection. Respondent contends that this ground for relief is without merit.

Like Ground 6, this ground for relief raises a state evidentiary issue, which ordinarily would not be redressable in a federal habeas corpus case, unless the alleged error violates a specific constitutional right which is so prejudicial that it denies due process. Harrison v. Dahm, supra; Clark v. Groose, supra.

On direct appeal, the Missouri Court of Appeals held as follows:

> Motley claims that the trial court erred by denying his motion to suppress several statements he made to the police (and the evidence derived therefrom) in response to police questioning that took place on three occasions over several days. Motley does not contend that any of the statements were obtained in violation of *Miranda*. Instead, he takes the position that the lengthy and repeated interrogations were inherently coercive. The State responds, contending that the totality of the circumstances reveals that Motley's statements were voluntary

-15-

and uncoerced. The State further contends that Motley kept changing his story, necessitating repeated questioning to clarify his version of the facts. The State also argues that duration of questioning, alone, does not equal coercion.

This court's review of the trial court's ruling on a motion to suppress is limited to a determination of whether the evidence is sufficient to support the trial court's ruling . *State v. Carter*, 955 S.W.2d 548, 560 (Mo. banc 1997). The facts and any reasonable inferences arising therefrom are to be viewed in a light most favorable to the ruling of the trial court. *Id.* Deference is given to the trial court's superior opportunity to determine credibility and factual findings, but our review of the trial court's legal conclusion based upon those facts is ultimately *de novo*. *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

To determine whether Motley's statements were properly admissible, the question that must be answered is whether those statements were voluntary. To assess the voluntariness of a defendant's statement, we look to the totality of the circumstances surrounding the statement. *See State v. Whittle*, 813 S.W.2d 336, 338 (Mo. App. 1991). A statement is not voluntary if the defendant "was deprived of a free choice to admit, to deny, or to refuse to answer..." and if the defendant was subject to "physical or psychological coercion ... of such a degree that the defendant's will was overborne." *Id.* (quoting *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986)).

Motley made several statements over the series of days he was interviewed by the police. The specific circumstances surrounding each day is summarized below.

*May 25 Interview*: Motley was interviewed at the Monroe City Police Department. He was not in custody during the questioning and was free to leave at any time. Three hours into the interview, Motley was advised of his *Miranda* rights. The total period during which Motley was interviewed spanned eight to ten hours, but frequent breaks were taken during that time, including some that were characterized as "very long." At the conclusion of the interview, the investigating officer asked Motley to return the following day to the Centralia Police Department for further questioning.

*May 26, 1999 Interview*: Motley returned voluntarily to the Centralia Police Department. Further questioning was conducted by the officers, which included additional questioning about the statement Motley had made the previous day. The total length of this second

-16-

interview was approximately thirty minutes. Afterwards, Motley was permitted to leave the station.

*June 10, 1999 Interview*: Motley was being held at the Monroe City Police Department on unrelated criminal charges. At approximately 5:00 p.m., while Motley was sitting near the station conference room, he was approached by Officers Stubbs and Jezylo. Motley was not handcuffed or restrained at the time. Sometime after the officers confronted Motley with the results of the handwriting analysis of the check from the victim's checkbook, and their discovery of a witness who saw Motley with the victim's handgun, Motley began to outline a very different version of the facts than he had given previously. At that point, approximately 6:30 p.m., Motley was again advised with the *Miranda* warnings. Motley indicated that he understood those warnings and still wished to speak to the officers. The interview with Motley proceeded until about 1:36 a.m., during which time his story evolved yet again, as he no longer denied being at Throop's residence the morning of the murder. He agreed to give a written statement, after he was again read his *Miranda* rights. The ten-page written statement was completed at approximately 4:00 a.m. The evidence before the trial court shows that throughout the entire interview process, frequent breaks were taken, and Motley was provided food, drink, and regular bathroom breaks.

At the conclusion of his written statement, Motley was left alone by the officers, and he slept in his chair for some time. Sometime later that morning, Motley was arrested and transported to the Centralia Police Department, a forty-five minute trip. After arriving at Centralia, Motley slept in a holding cell for two hours. Later that morning, Motley agreed to provide a videotaped statement, after again being read his *Miranda* rights. According to the videotaped statement, Motley began his statement at about 10:48 a.m. and concluded about 12:04 p.m.

The issue before this court is whether any of the statements made by Motley, in the interviews above, were voluntary. With regard to the May 25 and May 26 interviews, the record before the trial court clearly supports the ruling that statements made by Motley during those interviews were voluntary. First, Motley was not in custody during either of those interviews. Motley came to the police station of his own free will and later left of his own accord. While the interview held on May 25 was lengthy, there is no evidence in the record that he was being held against his will at the station. Nor does the record indicate that he was deprived of rest, food, or drink during either of those interviews. Motley was also advised of his *Miranda*

Case 4:05-cv-00827-FJG    Document 13    Filed 04/19/06    Page 17 of 23

rights during those interviews. Thus, the facts before the trial court do not support Motley's contention that the statements made by Motley on May 25 and May 26 were made as the result of improper coercion by the investigating officers.

The interview beginning on June 10, 1999, requires closer scrutiny. As stated above, Motley was already in custody, having been arrested on an outstanding warrant on an unrelated offense. There was some discussion in the trial record that Motley may have been awake since 6:00 a.m. that day. It is unclear how long Motley had been in custody before the officers began to question him regarding this crime around 5:00 p.m. While the record before the trial court indicates that several breaks were taken and Motley had [an] opportunity to eat at various points in the interview, the record also indicates that he was apparently not able to sleep until after he finished his written statement at 4:00 a.m. the following morning, eleven hours after the interview began. After completing his written statement, Motley fell asleep in his chair. The evidence before the trial court does not clearly show how long [h]e was able to sleep in the interview room before he was transported to Centralia. He was only able to sleep for an additional two hours before he began his videotaped statement at approximately 11 a.m. on June 11.

Motley did not testify during the suppression hearing. Indeed, the only information we have regarding the June 10 interview comes from the testimony of officers Stubbs and Jezylo. Motley urges us to infer from their testimony that he was deprived of rest and food, while asked to repeat his version of events many times. We must view the officers' testimony in the light most favorable to the trial court's ruling, however. In that light, it is clear that Motley was given opportunities to rest, and he either ate when the officers ate, or at least had the opportunity to eat as well. To the extent that Motley was subjected to repeated questioning, this appears to have been occasioned by the frequent and substantial revisions he would make upon each iteration of the story.

This court was provided a copy of Motley's videotaped statement, which was also part of the record before the trial court. Motley was obviously fatigued, frequently yawning during the statement. It is notable, however, that most of Motley's videotaped statement consists of an extended and detailed narrative of the events from May 19 through May 25, 1999. During that narrative, there were few questions posed by Officer Stubbs. With regard to the limited questioning by the officer, Motley was lucid, attentive, and prompt in his responses to those questions. Motley asked for clarification if

Case 4:05-cv-00827-FJG   Document 13   Filed 04/19/06   Page 18 of 23

he did not understand the officer's questions. He denied being mistreated or threatened by the investigating officers at any prior point. Taken as a whole, his demeanor during the videotaped statement suggests that while Motley may not have slept at any pont between the beginning of the interview and 4:00 a.m. the following day, he was not so impaired by the lack of sleep such that his "will was overborne." *Whittle*, 813 S.W.2d at 338.

The record before the trial court contains no other indication that Motley's statement was not voluntary. Motley did not testify at trial or the pretrial suppression hearing. Beyond the indication in the record that Motley did not have an opportunity to sleep until approximately 4:00 a.m., there is no evidence in the record which suggests that the investigating officers intentionally deprived Motley of sleep in an attempt to coerce a confession from him. Viewing the facts before the trial court in the light most favorable to the trial court's ruling, we hold that the statements made by Motley were voluntary and, therefore, properly admissible at trial. Motley's second point on appeal is denied.

(Respondent's Exhibit "G," p. 11-15).

The resolution of Ground 7(a) by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Terry Williams v. John Taylor, supra.

Ground 7(a) is denied.

## **PROCEDURAL DEFAULT - GROUNDS 3, 4, 7(b), 8, 9, & 10**

In Ground 3, petitioner alleges that his trial counsel was ineffective for failing to pursue an alibi defense for petitioner because had trial counsel investigated the matter, he would have discovered petitioner's alibi was supported by the victim's time of death. In Ground 4, petitioner alleges that his trial counsel, direct appeal counsel, and post-conviction appeal counsel all failed to

-19-

disclose the state's evidence to him. Petitioner alleges that the state's evidence excluded him from the crime scene and that, if this information had been provided to him, he could have raised these claims during his previous appeals. In Ground 7(b), petitioner alleges that his statements to police on June 10-11, 1999, were obtained in violation of his <u>Miranda</u> rights. In Ground 8, petitioner alleges that his trial counsel was ineffective for allowing the prosecution to elicit false testimony from witness Brian Hoey, who "falsely" testified that evidence from the crime scene showed that petitioner's blood was mixed with the victim's blood. Petitioner further alleges that the DNA report indicates that petitioner's blood was not found at the scene. In Ground 9, petitioner alleges that his trial counsel was ineffective for failing to call criminalist Jenny Smith, as a witness because she would have testified that many of the items of physical evidence found at the crime scene did not match petitioner or the victim. In Ground 10, petitioner alleges that the trial court erred when it submitted accomplice liability instructions to the jury because the state tried petitioner under a principal liability theory.

Respondent contends that Grounds 3 and 4 are procedurally defaulted because they were not raised on appeal from the denial of petitioner's motion for post-conviction relief. Respondent also contends that Ground 8 and 9 are procedurally defaulted because they were not raised in petitioner's original motion for post-conviction relief and were never presented to any Missouri court. Finally, respondent contends that Ground 10 is procedurally defaulted because petitioner failed to raise this claim on direct appeal. The record reflects that respondent is correct.

In <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991), the Supreme Court held

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to

Case 4:05-cv-00827-FJG    Document 13    Filed 04/19/06    Page 20 of 23

consider the claims will result in a fundamental miscarriage of justice.

Id. at 750.  Cause, actual prejudice, and the probability of a "fundamental miscarriage of justice" are to be judged under criteria set out in Wainwright v. Sykes, 433 U.S. 72 (1977), and Murray v. Carrier, 477 U.S. 478 (1986).  Coleman, 501 U.S. at 748-50.

A review of the record indicates that Grounds 8 and 9 were not raised in petitioner's amended motion for post-conviction relief and that Grounds 3 and 4 were not raised on appeal from the denial of petitioner's motion for post-conviction relief.  (Respondent's Exhibit "H," pp. 1, 11; "J," pp. 25-28).  The record also reflects that Grounds 7(b) and 10 were not raised on direct appeal. (Respondent's Exhibit "E," pp. 16-18).  Consequently, these grounds for relief are procedurally defaulted and may not be reviewed by this Court unless petitioner can demonstrate cause and actual prejudice, or that failure to consider his claims will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).  This Court will not reach the "prejudice" component of the analysis unless it first finds that the petitioner has demonstrated "cause" for his procedural default.

In his reply, petitioner concedes that these grounds for relief are procedurally defaulted, and makes no further response to the issue, other than to request more time to reply.  Petitioner also alleges that his claims are defaulted because his direct appeal counsel and post-conviction appeal counsel failed to raise these claims on direct appeal and on appeal from the denial of his motion for post-conviction relief.

Because there is no constitutional right to an attorney in state post-conviction proceedings, see, e.g., Pennsylvania v. Finley, 481 U.S. 551, 555-59 (1987), ineffective assistance of post-conviction relief counsel cannot excuse state procedural default, Coleman v. Thompson, 501 U.S.

-21-

at 752; Boyd v. Delo, 999 F.2d 1286, 1288 (8th Cir. 1993); Nolan v. Armontrout, 973 F.2d 616, 617 (8th Cir. 1992). Furthermore, petitioner did not raise the issue of ineffective assistance of direct appeal counsel in his motion for post-conviction relief. Therefore, petitioner's claim that direct appeal counsel was ineffective is itself procedurally defaulted and cannot constitute cause for procedural default as to any of the original grounds for relief.

Even though petitioner has failed to demonstrate cause (and, therefore, we do not consider prejudice) for his procedural default, the Court can still reach the merits of his claims if he can show that he is "probably actually innocent" of the crimes for which he was convicted. Bowman v. Gammon, 85 F.3d 1339, 1346 (8th Cir. 1996), cert. denied, 520 U.S. 1128 (1997). To demonstrate his innocence, petitioner must satisfy a two-part test: First, he must support his allegations of constitutional error "with new reliable evidence. . . that was not presented at trial." Second, he must establish "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id., citing Schlup v. Delo, 513 U.S. 298 (1995). Although petitioner makes generalized allegations of actual innocence in his petition, a review of the record reflects that petitioner has failed to satisfy this test.

Petitioner has failed to show cause for and prejudice from his default of Grounds 3, 4, 7(b), 8, 9, and 10. He also has failed to meet the Schlup standard for actual innocence. Id. Therefore, federal review of these allegations is not required to prevent a fundamental miscarriage of justice. Murray v. Carrier, 477 U.S. at 495.

Grounds 3, 4, 7(b), 8, 9, and 10 are denied.

## REQUEST FOR AN EVIDENTIARY HEARING

In his reply, petitioner requests an evidentiary hearing. Because the factual record currently before the Court is sufficient to make a determination of petitioner's claims, the Court finds that an

Case 4:05-cv-00827-FJG   Document 13   Filed 04/19/06   Page 22 of 23

evidentiary hearing is unwarranted and plaintiff's request will be denied. <u>See</u> 28 U.S.C. §

2254(e)(2)(A)&(B); Rule 8(c) of the Rules Governing Section 2254 Cases.

## <u>ORDER</u>

Accordingly, it is **ORDERED** that:

(1) petitioner's request for an evidentiary hearing is denied;

(2) the above-captioned petition for a writ of habeas corpus is denied; and

(3) this case is dismissed with prejudice.

/s/ Fernando J. Gaitan, Jr.
FERNANDO J. GAITAN, JR
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri
Dated: 4/19/06